UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DENISE J. SIRACUSE,

               Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
_____

DECISION & ORDER

14-CV-6681P

**PRELIMINARY STATEMENT**

        Plaintiff Denise J. Siracuse ("Siracuse") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

        Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 6, 11). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

**I.    Procedural Background**

Siracuse protectively filed for DIB on June 29, 2012, alleging disability beginning on January 1, 2011, due to bilateral carpal tunnel syndrome and back, neck, and shoulder problems. (Tr. 173, 176).[1] On October 15, 2012, the Social Security Administration denied Siracuse's claim for benefits, finding that she was not disabled. (Tr. 92). Siracuse requested and was granted a hearing before Administrative Law Rosanne M. Dummer (the "ALJ"). (Tr. 56, 107-08, 125-51, 153-58). The ALJ conducted a hearing on May 13, 2013 in Rochester, New York. (Tr. 56-82). In a decision dated May 28, 2013, the ALJ found that Siracuse was not disabled and was not entitled to benefits. (Tr. 29-44).

On October 31, 2014, the Appeals Council denied Siracuse's request for review of the ALJ's decision. (Tr. 1-6). In the denial, the Appeals Council considered additional medical treatment records, some of which predate and some of which postdate the ALJ's determination, but none of which were submitted until after the ALJ had rendered her decision. (Tr. 1-2, 8-27, 295-322). The Appeals Council concluded that certain of the records did "not provide a basis for changing the [ALJ's] decision" and that others, along with a medical source opinion, related to "a later time." (Tr. 2). Siracuse commenced this action on December 9, 2014 seeking review of the Commissioner's decision. (Docket # 1).

---

[1]   The administrative transcript shall be referred to as "Tr. __."

## II.     Relevant Medical Evidence[2]

### A.     Treatment Records

The record demonstrates that Siracuse began treatment with David Mitten ("Mitten"), MD, for carpal tunnel syndrome in September 2008. (Tr. 212). Previous nerve studies conducted by Dr. Maroldo on July 11, 2008 revealed mild to moderate carpal tunnel syndrome on the right and mild carpal tunnel syndrome on the left. (*Id.*). Mitten recommended surgery on Siracuse's right hand, which was conducted on November 10, 2008. (Tr. 215). The surgery was successful, and Mitten believed that Siracuse would be able to return to work at the beginning of December 2008. (Tr. 211).

In August 2009, Siracuse was terminated from her employment as an accountant clerk. (Tr. 90). Siracuse returned for treatment with Mitten in November 2010 with complaints of left hand carpel tunnel syndrome. (Tr. 210). Again, Mitten recommended and performed surgery. (Tr. 210-14).

Siracuse began receiving treatment from internist Anuj Bansal ("Bansal"), MD, for complaints of back pain in May 2012. (Tr. 254). Siracuse indicated that she suffered from low back pain of moderate intensity that was exacerbated by sitting. (Tr. 256). She reported no leg weakness, but indicated that she had recurring pain in both hands that got worse at night. (*Id.*). Siracuse also reported a fifty pound intentional weight loss. (*Id.*). Bansal assessed likely arthritis and referred Siracuse for x-ray imaging and physical therapy. (*Id.*). Bansal recommended that Siracuse wear braces at night for her hand pain. (*Id.*). The x-ray images revealed mild degenerative changes of the lumbar spine, most notable at L5-S1. (Tr. 259).

Siracuse attended physical therapy between June 26, 2012 and July 17, 2012, at which time therapy was deferred until after additional medical testing. (Tr. 216-37). During her

---

[2] Those portions of the treatment records that are relevant to this decision are recounted herein.

3

initial evaluation, Siracuse reported suffering back pain for the previous ten years that had intensified within the last year. (Tr. 220). She reported experiencing pain throughout her back, which did not radiate to her extremities. (*Id.*). According to Siracuse, her pain was aggravated by sleeping, lifting, prolonged sitting and standing, and bending forward, although she was able to walk and climb stairs. (*Id.*). She reported that she was a stay-at-home mother who enjoyed walking on her treadmill. (*Id.*). During her physical therapy sessions, Siracuse began to complain of neck pain. (Tr. 231).

In September 2012, Siracuse was evaluated by Thomas Rodenhouse ("Rodenhouse"), MD, a neurosurgeon. (Tr. 239). She explained that she had suffered intermittent back pain for the previous four years that had become constant during the past six months. (*Id.*). Siracuse reported pain in her back that radiated to her neck, shoulders, and arms, and that she had tolerable days and bad days. (Tr. 240). Her pain was aggravated by all positions, requiring her to change positions frequently. (*Id.*). She reported that physical therapy had aggravated her preexisting carpal tunnel syndrome and that medication had not improved her symptoms. (*Id.*).

Rodenhouse reviewed an x-ray of Siracuse's lumbar spine that demonstrated good alignment, absence of fractures, and mild degenerative disease at L5. (Tr. 241). Upon examination, Rodenhouse noted no weakness with hip flexion, knee extension and flexion, foot dorsiflexion, and plantar flexion. (*Id.*). Her knee reflexes were absent. (*Id.*). Siracuse's lumbar flexion was minimally restricted, and her extension was uncomfortable but unrestricted. (*Id.*). Rodenhouse recommended that Siracuse attend aqua therapy for her neck and arm pain and ordered images of her cervical spine. (*Id.*).

Siracuse attended aquatic physical therapy between September 2012 and November 2012. (Tr. 273-87). Siracuse reported that she continued to experience pain in her lower back and legs that was exacerbated by prolonged sitting, standing, walking, and lying down. (Tr. 274). She was discharged from treatment on November 29, 2012 because she reported no improvement and worsening symptoms. (Tr. 285). At the time of discharge, Siracuse reported that she had an upcoming medical appointment to evaluate her ongoing pain and to plan her next course of treatment. (Tr. 287).

On March 12, 2013, Siracuse returned for an appointment with Bansal. (Tr. 292-93). She complained of continued lower back pain without radiation and recurring pain in her hands. (*Id.*). Siracuse reported that she had been seen by a neurosurgeon regarding her back pain and that her testing results were negative for carpal tunnel syndrome. (*Id.*). Siracuse reported that she had not experienced any relief from pain medication or physical therapy and that her pain was aggravated by sitting. (*Id.*). Bansal opined that Siracuse likely suffered from arthritis, as demonstrated on her x-rays. (*Id.*). He encouraged her to lose weight, prescribed Flexeril, advised her to continue taking Naprosyn, and ordered additional labs to determine whether there was any inflammation. (*Id.*). Bansal indicated that if the lab results were normal, he would order an MRI to identify the source of her back pain. (*Id.*). Bansal recommended that she wear braces at night for her continued hand pain. (*Id.*).

### B.     **Medical Opinion Evidence**

On October 5, 2012, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative orthopedic examination of Siracuse. (Tr. 261-67). He opined that Siracuse had moderate to severe limitations for bending, lifting, and squatting and moderate limitations for standing, walking, or sitting for a long time. (*Id.*). He also opined that Siracuse had mild to

5

moderate limitations for grasping, holding, writing, tying shoes, zipping zippers, buttoning buttons, and manipulating coins. (*Id.*). Similarly, he assessed mild to moderate limitations for pushing, pulling, reaching, and twisting of her cervical spine. (*Id.*). Toor opined that pain would interfere with Siracuse's physical routine. (*Id.*).

### C.     Evidence Submitted to the Appeals Council

After the ALJ's decision, Siracuse submitted additional medical records to the Appeals Council. (Tr. 1-2, 5). These records included treatment notes from Mitten's office in October and December 2012 and treatment notes from Bansal in May and September 2013. (Tr. 295-97, 298-322). The Appeals Council considered these records, but determined that they did not provide a basis for altering the ALJ's determination. (Tr. 1-2). Siracuse also submitted treatment records from Clifford Everett ("Everett"), MD, dated October 2013 and March, July and October 2014, as well as a medical source opinion questionnaire dated October 17, 2014. (Tr. 8-9, 14-15, 20-27). The Appeals Council determined that the information from Everett was "new information" concerning a "later time" and therefore did not "affect the decision about whether [Siracuse was] disabled beginning on or before May 28, 2013." (Tr. 2). The additional information submitted to the Appeals Council is summarized below.

On October 29, 2012, Siracuse attended an appointment with Christie L. Bowen ("Bowen"), a nurse practitioner who worked with Mitten, to assess her bilateral hand discomfort. (Tr. 297). Siracuse was concerned that her carpal tunnel had returned. (*Id.*). She also reported suffering from neck and back pain. (*Id.*). Upon examination, Bowen observed no atrophy of the hands and was "unable to reproduce or exacerbate the symptoms that prompted the evaluation." (*Id.*). Bowen opined that her clinical findings were not consistent with classic carpal tunnel

6

recurrence.  (*Id.*).  Siracuse declined diagnostic or therapeutic injections, but agreed to repeat an electrodiagnostic study to evaluate for peripheral neuropathy or cervical radiculopathy.  (*Id.*).

Siracuse returned for a follow-up appointment with Mitten on December 12, 2012.  (Tr. 296).  The treatment notes indicate that the electrodiagnostic study produced normal results, and Mitten questioned whether Siracuse suffered from a "lupus-like syndrome."  (*Id.*).  He indicated that her main problem appeared to be back pain, and he recommended that she obtain treatment for her back and follow up with him as needed.  (*Id.*).

On May 30, 2013, Siracuse returned for another appointment with Bansal.  (Tr. 304-06).  During the appointment, Siracuse complained of continued low back and neck pain of moderate intensity.  (*Id.*).  Siracuse indicated that her pain was worse with sitting, but that she did not experience any weakness in her arms or legs.  (*Id.*).  She reported no relief from pain medication or physical or aquatic therapy.  (*Id.*).  She also reported fatigue and difficulty sleeping.  (*Id.*).  Bansal assessed that she likely suffered from arthritis and advised her to exercise and to continue taking pain medication.  (*Id.*).  He indicated that an MRI might be warranted if her pain continued.  (*Id.*).  He referred her for a sleep study to determine if she suffered from obstructive sleep apnea.  (*Id.*).

Siracuse returned for an appointment with Bansal on September 4, 2013.  (Tr. 302-03).  She continued to complain of low back and neck pain.  (*Id.*).  Siracuse reported that the pain was a level seven of ten and that it radiated to her entire back.  (*Id.*).  The pain prevented her from completing household chores and completing daily tasks.  (*Id.*).  Bansal recommended that she continue to take Naprosyn and ordered an MRI.  (*Id.*).

An MRI of Siracuse's lumbar and cervical spine was conducted on September 10, 2013. (Tr. 316-18). The images demonstrated bony degenerative changes and degenerative disc disease in both her cervical and lumbar spine. (*Id.*).

On October 21, 2013, Siracuse began treatment with Everett. (Tr. 20). She reported suffering from chronic lower back pain for several years, with constant pain over the past year. (*Id.*). According to Siracuse, the source of the pain was her lower back, although the pain radiated upward into her mid-back and neck. (*Id.*). Her pain was exacerbated by vacuuming, household chores, lifting, bending, and remaining in any position for a prolonged period. (*Id.*). Everett's physical examination demonstrated essentially normal findings with the exception of diffuse muscle tenderness of the bilateral upper trapezius, bilateral hip, bilateral PSIS area, bilateral medial quadriceps, and left lateral elbow. (*Id.*). Everett reviewed Siracuse's MRI results and assessed that she suffered from myofascial pain, rather than any true radicular problem. (*Id.*). According to Everett, the imaging results were "nondescript with her clinical picture." (*Id.*). He recommended a trial of Gabapentin and reassessment in a few weeks. (*Id.*).

On March 31, 2014, Siracuse returned to Everett's office for a follow-up appointment for complaints of neck and bilateral arm dysesthesia. (Tr. 14). Treatment notes indicate that Siracuse had been taking Gabapentin, which had initially provided some relief, but was now experiencing breakthrough symptoms. (*Id.*). Everett assessed that Siracuse suffered from fibromyalgia with cervicalgia. (*Id.*). He noted that she was status post bilateral carpal tunnel release surgery, but continued to experience upper extremity paresthesias. (*Id.*). He suggested that Siracuse begin taking Lyrica instead of Gabapentin and discussed the option of aquatic therapy. (*Id.*). Siracuse declined aquatic therapy until the summer. (*Id.*).

Siracuse returned for an appointment with Everett on July 14, 2014. (Tr. 14-15). She reported some improvement with Lyrica and that she was walking ten minutes per day. (*Id.*). She continued to experience pain in her neck and lower back with prolonged sitting. (*Id.*). Everett recommended that Siracuse continue taking Lyrica and that she take Ibuprofen before engaging in activities that required prolonged sitting. (*Id.*). Again, Everett considered aquatic therapy, but ultimately determined that it was not warranted at this time because Siracuse was making progress with her walking therapy. (*Id.*). He expected that she would be walking for fifteen minutes per day by the time of her next appointment. (*Id.*).

On October 17, 2014, Everett completed a medical source opinion questionnaire regarding Siracuse's physical ability to perform work-related functions. (Tr. 8-9). He diagnosed Siracuse as suffering from cervicalgia with low grade radicular pain and low back pain with a protrusion in her left lower back. (*Id.*). He indicated that she experienced severe pain that was aggravated by bending, lifting, prolonged positions, housework, and vacuuming. (*Id.*). He opined that Siracuse would frequently[3] experience pain or other symptoms that were severe enough to interfere with the attention and concentration needed to perform simple work tasks. (*Id.*). According to Everett, Siracuse could rarely[4] lift ten pounds or less and could never lift over ten pounds in a competitive work situation. (*Id.*). He also opined that she could only occasionally[5] climb stairs and could rarely twist, stoop, crouch/squat, or climb ladders. (*Id.*). According to Everett, Siracuse could sit, stand, and walk for less than two hours in an eight-hour workday, and could sit and stand for approximately ten minutes at a time before needing to change positions. (*Id.*). Everett opined that Siracuse suffered from pain that significantly

---

[3] Frequently was defined to indicate 34% to 66% of an eight-hour workday. (Tr. 8).

[4] Rarely was defined to indicate 1% to 5% of an eight-hour workday. (Tr. 8).

[5] Occasionally was defined to indicate 6% to 33% of an eight-hour workday. (Tr. 8).

9

impaired her daily functioning and that she was likely to be absent from work approximately four days per month. (*Id.*).

### III.     Non-Medical Evidence

In her application for benefits, Siracuse reported that she was born in 1974 and had completed more than four years of college. (Tr. 161, 177). According to Siracuse, she was last employed in 2009 as an accounting clerk. (*Id.*).

Siracuse reported that she lives with her husband and two children. (Tr. 190). According to Siracuse, she provides care for her daughters, although it is very difficult. (Tr. 191). Siracuse reported difficulty sleeping and caring for her personal hygiene due to pain. (Tr. 192). According to Siracuse, she was able to prepare simple meals only, and although she attempted to perform household chores, including laundry, washing dishes, and cleaning the bathroom, she required frequent rest breaks. (Tr. 193-94). She reported that she left the house daily and was able to drive a car. (Tr. 194). She also was able to grocery shop for short periods of time and could not carry any heavy items. (Tr. 195).

Siracuse reported that she enjoyed watching television, but that her pain required her to constantly shift positions. (*Id.*). She also reported difficulty lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, and using her fingers. (Tr. 197). She estimated that she was able to walk for approximately five minutes before needing to rest. (Tr. 198). According to Siracuse, she suffered from a dull, achy pain in her back that radiated to her neck and buttocks. (Tr. 201). She also experienced pain in her hands and reported that they would sometimes "freeze up." (*Id.*).

During the administrative hearing, Siracuse testified that she had an accounting degree and had previously been employed as an accounting clerk until her termination. (Tr. 60-61). According to Siracuse, she was terminated because she was unable to satisfy the requirements of her job due to pain in her hands. (Tr. 61).

Siracuse testified that she was unable to work because of pain in her hands, back, neck and shoulders, and lack of sleep. (Tr. 62). According to Siracuse, she had been referred for physical therapy without relief and expected to be referred for an MRI. (*Id.*). With respect to her hands, Siracuse testified that results of nerve conduction studies of her hands in November 2012 demonstrated that she did not require surgery for carpal tunnel syndrome. (Tr. 62-63). Siracuse testified that she takes Vicodin and a muscle relaxer, which causes drowsiness. (Tr. 64). According to Siracuse, she experiences constant, achy pain throughout her body, especially in her lower back, shoulders, and neck. (Tr. 69-70). She also experiences pain in her hands. (Tr. 70).

According to Siracuse, she has difficulty walking and standing, but has not been prescribed any assistive device. (Tr. 64-65). She also reported difficulty sitting for prolonged periods and that she frequently needs to adjust her position due to pain. (Tr. 65). Siracuse testified that she lives with her husband and her daughters, ages five and three. (Tr. 66). On a typical morning, she assists her older daughter with dressing, takes her to school, and spends the remainder of the day caring for her younger daughter. (*Id.*). She also attempts to complete one household chore per day, although her mother frequently assists her with chores. (Tr. 66-67). She also goes grocery shopping approximately five times per week. (Tr. 69). According to Siracuse, she is unable to shop for extended periods of time, necessitating frequent, short trips to the store. (*Id.*).

**DISCUSSION**

**I.     Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

13

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.     The ALJ's Decision

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 32-41).  Under step one of the process, the ALJ found that Siracuse has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date. (Tr. 34). At step two, the ALJ concluded that Siracuse has the severe impairments of degenerative disc disease, status post-2008 right carpal tunnel release and status post-2009 left carpal tunnel release with residuals, and obesity. (*Id.*).  At step three, the ALJ determined that Siracuse does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 34-35).  The ALJ concluded that Siracuse has the Residual Functional Capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds frequently, can sit, stand, or walk for six hours during an eight-hour workday, can perform unlimited balancing, is limited to occasional climbing, stooping, crouching, and crawling, and can perform frequent, but not continuous or repetitive, gross and fine manipulation bilaterally. (Tr. 35-39).  At steps four and five, the ALJ determined that Siracuse was able to perform her former work as an accountant clerk and could perform other jobs that existed in the local and national economy, including injection molding machine tender, assembly machine tender, cashier, food order clerk, sorting machine operator, and polishing machine operator. (Tr. 29). Accordingly, the ALJ found that Siracuse is not disabled. (*Id.*).

**III.     Analysis**

Among other alleged errors, Siracuse contends that remand is warranted because the Appeals Council failed to properly consider Everett's treatment records and medical assessment that were submitted after the hearing.  (Docket # 6-1).  I agree.

The regulations require the Appeals Council to consider "new and material" evidence "if it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010).  "If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision," although the "[n]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review."  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Perez v. Chater*, 77 F.3d at 45).  "The role of the district court is to review whether the Appeals Council's action was in conformity with [the] regulations."  *Ahearn v. Astrue*, 2010 WL 653712, *4 (N.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000)).

The parties dispute whether Everett's treatment notes and opinion relate "to the period on or before the date of the [ALJ's] hearing decision," as required by the regulations.  *See* 20 C.F.R. §§ 404.970(b) and 416.1470(b).  The Commissioner argues that Everett's treatment notes and opinion cannot relate to the relevant period because Everett first started treating Siracuse in October 2013, six months after the ALJ rendered her decision, and because nothing

15

in the records or the opinion explicitly indicate that Everett's conclusions were retrospective in nature.  (Docket # 10 at 17).  Siracuse counters that the records make clear that Everett was treating Siracuse for her ongoing complaints of back and neck pain, and that his treatment notes and opinion are particularly relevant because he diagnosed Siracuse with fibromyalgia.  (Docket # 6-1 at 19).

It is well-established that "medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing."  *Newbury v. Astrue*, 321 F. App'x 16, *2 n.2 (2d Cir. 2009).  Rather, in evaluating new evidence, the Court should "distinguish between new evidence that reflects on the severity of the plaintiff's impairment as it existed during the time for which benefits were denied and new evidence which represents new impairments which would not have affected the decision below."  *Sears v. Colvin*, 2013 WL 6506496, *5 (N.D.N.Y. 2013).  Evidence that is generated after an ALJ's decision may nevertheless bear on the evaluation of the claim if the "evidence directly supports [the claimant's] earlier contentions regarding [her] condition . . . [or] strongly suggests that, during the relevant time period, [her] condition was far more serious than previously thought."  *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004).  This is especially true where subsequent evidence contains a diagnosis that "sheds considerable new light on the seriousness of [a claimant's] condition."  *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991).  Under such circumstances, the new evidence containing the diagnosis is "material and justifies remand."  *Id.*

Having reviewed the record, I conclude that Everett's treatment notes and opinion relate to the relevant period.  The record makes clear that Siracuse suffered from ongoing back and neck pain for which she sought ongoing treatment from Bansal and Rodenhouse beginning in 2012.  Siracuse attempted different treatment, including pain medication and physical and

16

aquatic therapy, none of which provided relief.  In March and May 2013, Bansal indicated that he would order an MRI to attempt to identify the source of Siracuse's pain if she continued to fail to respond to treatment.  The MRI was conducted in September 2013, and Siracuse began treatment with Everett the following month.  Everett reviewed the MRI, performed a physical examination of Siracuse, and opined that she suffered from fibromyalgia with cervicalgia.

In sum, Siracuse sought treatment from Everett after failing to manage her pain through a variety of treatments recommended by her primary care physician and a neurosurgeon. Thus, the record demonstrates that Siracuse sought treatment from Everett for the same condition for which she sought benefits – her ongoing, chronic back and neck pain.  Further, Everett's diagnosis of fibromyalgia sheds light on Siracuse's prior symptoms and complaints and may explain the lack of significant objective findings produced by imaging or physical examinations of Siracuse.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("a growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease'") (quoting *Preston v. Sec. of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Davidow v. Astrue*, 2009 WL 2876202, *4 (W.D.N.Y. 2009) ("objective findings in cases involving fibromyalgia and similar disorders may be minimal").  Further, Everett's opinion regarding Siracuse's work-related capabilities, including her inability to lift objects weighing more than ten pounds, her "rare" ability to lift objects weighing ten pounds or less, and her inability to stand or walk for two hours or more during a workday, appears inconsistent with the ALJ's conclusion that Siracuse retained the ability to perform the exertional requirements of light work.  *See Alianell v. Colvin*, 2016 WL 981864, *13 (W.D.N.Y. 2016) ("[l]ight work requires approximately six hours of standing and/or walking during an eight-hour workday and requires

frequent lifting or carrying of objects weighing ten pounds") (citing 20 C.F.R. §§ 404.1567(b), 416.967(b)).

Under these circumstances, the information contained in Everett's treatment notes and opinion is clearly material as it "present[s] a reasonable possibility of influencing" the ALJ's decision, and remand is warranted. *See Lisa v. Sec'y of Dep't Health & Human Servs.*, 940 F.2d at 43-45 (reports from four physicians diagnosing claimant with fibromyalgia warranted remand because new diagnosis suggested that impairment was more severe than previously diagnosed and "substantially bolster[ed] the credibility of [her] subjective complaints"); *Sears v. Colvin*, 2013 WL 6506496 at *4-6 (Appeals Council erred by refusing to consider evidence "solely because it was created after the date of the ALJ's decision" where evidence consisted of treatment notes of physician who diagnosed plaintiff with fibromyalgia but did not examine plaintiff until approximately one year after ALJ's decision); *Hood v. Comm'r of Soc. Sec.*, 2012 WL 1029532, *8 (N.D.N.Y.) (Appeals Council erred by refusing to consider treatment notes and assessment from physician who diagnosed plaintiff with chronic obstructive pulmonary disease and first examined plaintiff four months after ALJ's decision); *report and recommendation adopted*, 2012 WL 1029524 (N.D.N.Y. 2012); *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204-05 (E.D.N.Y. 2007) (Appeals Council improperly rejected opinion from treating physician rendered approximately seven months after ALJ's decision where report provided information regarding severity and expected progression of plaintiff's disease). Of course, the Appeals Council's error is a different question from whether, on remand, Everett's opinion must be given controlling weight or whether Siracuse is ultimately entitled to benefits.

Siracuse also challenges the decision on the grounds that (1) the ALJ's RFC assessment is inconsistent with the limitations assessed by Toor, despite the ALJ's apparent

reliance on Toor's opinion (Docket # 6-1 at 21-22); (2) the ALJ failed to develop the record by seeking an opinion from a treating physician (*id.* at 23-25); and, (3) the ALJ failed to appropriately assess Siracuse's credibility (*id.* at 25-30).  In light of my determination that remand is otherwise warranted, I decline to reach Siracuse's remaining contentions.  *See Erb v. Colvin*, 2015 WL 5440699, *15 (W.D.N.Y. 2015) (declining to reach remaining challenges to the RFC and credibility assessments where remand requiring reassessment of RFC was warranted).  Although I do not reach the issues, I note that should the ALJ continue to rely upon Toor's opinion on remand, the ALJ should consider explaining clearly how Toor's opinion – which assesses moderate to severe limitations for bending, lifting and squatting and moderate limitations for prolonged sitting, walking and standing – supports the conclusion that Siracuse is able to perform the exertional requirements of light work.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Siracuse's motion for judgment on the pleadings **(Docket # 6)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　*s/Marian W. Payson*
　　　　　　　　　　　　　　　　　　　　　　　　MARIAN W. PAYSON
　　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Dated: Rochester, New York
　　　　March 17, 2016